129 P.3d 966

**VALDER LAW OFFICES, an Arizona Professional Corporation, Plaintiff/Counter–Defendant/Appellant,**

v.

**KEENAN LAW FIRM, an Arizona Professional Corporation, Defendant/Counter–Plaintiff/Appellee.**

Nos. 1 CA–CV 05–0217, 1 CA–CV 05–0358.

Court of Appeals of Arizona, Division 1, Department A.

March 9, 2006.

---

* The Honorable Silvia R. Arellano, a judge of the Superior Court of Maricopa County, was authorized to participate as a Judge Pro Tempore of the Court of Appeals, Division One, by order of the Chief Justice of the Arizona Supreme Court in accordance with Arizona Constitution, Article 6, Section 31 and A.R.S. §§ 12–145 through –147 (2003).

Valder Law Offices Phoenix By Michael J. Valder and Lewis & Roca LLP By Lawrence A. Kasten, Kimberly A. Demarchi, Phoenix, Attorneys for Plaintiff/Counter–Defendant/Appellant.

Haralson Miller Pitt Feldman & McAnally PLC By Stanley G. Feldman, Lindsay E. Brew, Rebecca A. Reed, Tucson, and Murphy Lutey Schmitt & Fuchs PLLC By Michael R. Murphy, Prescott, Attorneys for Defendant/Counter–Plaintiff/Appellee.

## OPINION

BARKER, Judge.

¶ 1 This case requires us to decide an issue of first impression in Arizona: whether the common fund doctrine may apply to the allocation of attorneys' fees in a wrongful death action. We reject the argument that because this action is one for wrongful death, rather than a class action, the common fund doctrine may not apply. However, we hold that on the facts of this particular wrongful death case the trial court correctly determined that the common fund doctrine does not apply.

## I.

¶ 2 This case has its origins in an action for the wrongful death of Denise Robinson, who died in September 1997 after surgery.[1] Denise Robinson was survived by her husband, James Robinson ("James"), her son, James Jr., and her mother, Dorothy Evans ("Dorothy"). In October 1997, James retained attorney James Hill ("Hill") to represent him in the prosecution of an action against Denise's health care providers. Dorothy also attempted to retain Hill, but Hill informed her that she needed separate counsel.[2] On July 6, 1999, Dorothy retained the Keenan Law Firm ("Keenan") to "investigate, prosecute or settle" her claim for damages for Denise's wrongful death. Keenan's agreed contingency fee was forty percent of any sums collected or recovered through a first trial; if post-trial motions or an appeal was taken, the percentage increased to fifty.

¶ 3 On July 28, 1999, James signed a fee agreement jointly retaining Hill and also Valder Law Offices ("Valder")[3] to prosecute any claims for damages arising from Denise's death. On or about September 14, 1999, Valder commenced a wrongful death action for James as statutory plaintiff on behalf of himself and the other statutory beneficiaries.

The beneficiaries identified in the wrongful death action brought by James included himself, James, Jr. and Dorothy. Also named was Denver Evans as Denise Robinson's father, but Denver's claim was later dismissed when it was learned that he was not Denise Robinson's biological father and he had never adopted her. Shortly after the case was filed, Keenan entered his appearance in the action on behalf of Dorothy.

¶ 4 When the wrongful death action was filed, Valder wrote to Keenan to inform him of the filing and to assure him that James, as the surviving spouse and statutory plaintiff, would act as a fiduciary by bringing the case on behalf of himself and all other beneficiaries. Valder also advised Keenan that Valder and Hill would pursue the matter fully pursuant to James's fiduciary obligations:

> We will take all necessary actions such as interviewing witnesses, retaining expert witnesses, conducting discovery, attempting to reach a pre-trial settlement, trying the case if necessary, and seeking fair and just compensation for all of the beneficiaries including [Dorothy].

Valder provided Keenan with a copy of his contingency fee contract with James. He informed Keenan he did not see or anticipate any conflicts of interest or other reasons why Dorothy would need separate counsel, and he stated that this would be "especially true" if they reached agreement regarding allocation of any net settlement proceeds:

> Obviously, in the event of a trial, the jury will fix each beneficiary's damages separately and the jury's assessment of everyone's damages will guide the allocation of net proceeds from a judgment. In the calculation of net proceeds, whether by settlement or judgment, we will first deduct all costs and fees that are appropriate under our contingency fee contract, as approved by the court. Accordingly, any

---

1. We view all facts and inferences in the light most favorable to the party against whom summary judgment was granted. *Andrews v. Blake,* 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003).

2. At his deposition Hill did not specifically recall the reason he suggested separate counsel for Dorothy, but he believed the reason was to avoid any possible conflict of interest among the beneficiaries. Dorothy avowed that Hill told her it

would be a conflict of interest for him to represent her.

3. The parties have stipulated that the proper parties to this appeal are Valder Law Offices and the Keenan Law Firm. We grant the joint request to modify the caption as set forth on this document.

recovery allocated to [Dorothy] will be subject to a pro-rata reduction for attorney's fees and costs.

Valder proposed to Keenan that the beneficiaries attempt to reach an agreement as to an agreed percentage for each from any net settlement proceeds.

¶5 It appears from the record that the beneficiaries did not reach agreement as to the percentage of recovery for each in the event of settlement. Valder later asserted that Keenan obstructed his efforts to reach agreement. Prior to trial, a claim against one of the defendants was settled for a lump sum, and the beneficiaries could not agree as to how this amount should be allocated among them. They deferred distribution until the jury's damage award established the relative shares of the beneficiaries' recovery.

¶6 Valder testified that, in general, he did all of the work necessary to prepare the case with respect to liability issues.

[I]t was a medical malpractice case and there were numerous expert witnesses on all the medical issues, including nursing negligence, doctor negligence, and causation, and there was a lot of pathology evidence and pathology testimony and pathologists to cross-examine. And I don't remember how many medical or nursing witnesses there were. But I did all of that stuff.

Valder also stated he had handled all depositions for the defense's medical witnesses and had been responsible for obtaining medical experts for the plaintiff's case. He had handled all written discovery except for procuring draft answers from Dorothy for interrogatories directed to her, which was done by Keenan. Valder also handled all the motion practice.

¶7 When asked at his deposition what additional work Valder did in preparing the liability case because of Dorothy's involvement as a statutory beneficiary, Valder acknowledged that all of the work he did would have been necessary whether Dorothy had been a statutory beneficiary or just a percipient witness. Valder pointed out, however, that Dorothy's involvement required substantial work, including additional work as to the damage portion of the case. Valder attended Dorothy's deposition, examined her extensively at trial regarding liability and damages, developed testimony from a variety of other witnesses bearing on Dorothy's damage claim, and presented the case, including Dorothy's damage claim, to a focus group. Valder also had additional work because of the initial claim by Dorothy and Denver Evans about Denver's relationship to Denise.

¶8 Keenan provided an affidavit describing his efforts on behalf of Dorothy:

After filing the notice of appearance, I participated as the attorney for [Dorothy] throughout the duration of the litigation. I prepared discovery responses, and responded to correspondence from defense counsel. I personally attended certain depositions in the case, and participated in settlement negotiations. I reviewed all pleadings, written discovery, and correspondence exchanged between the parties in this case. I attended the hearings on the motions in limine, and engaged in pretrial preparations. I represented [Dorothy] at trial from start to finish which included, but was not limited to, giving an opening statement on [Dorothy's] behalf, examining [Dorothy] at trial, and giving a closing argument to the jury on behalf of [Dorothy]. My firm expended a minimum of 454.10 attorney/legal assistant hours up through the post-trial settlement on this matter.

Keenan did not purport to have been involved in the preparation and trial of the liability aspect of the case. Valder contended that the bulk of the 450 hours recorded by Keenan's firm was unnecessary and provided no value in obtaining the recovery.[4]

4. We note our concern with the nature of dispute that arose here. Clearly, there are cases where a statutory plaintiff and the other wrongful death beneficiaries have conflicts and need separate attorneys to represent their interests. Valder and Keenan could have easily agreed to share the responsibility of preparing and litigating the liability case and to a division of fees with their respective client's consent. See Ariz. Rules of Prof'l Conduct ER 1.5(e). If that had been done, the interests of the clients would have been served and much of the excess costs and hours of this satellite litigation would have been avoided. See In re Conservatorship of Fallers, 181 Ariz.

¶ 9 After a lengthy trial, the wrongful death action resulted in a jury verdict of $2.4 million, as follows:

James Robinson    $1 million
James, Jr.    $1 million
Dorothy Evans    $400,000 [5]

Valder prepared a settlement summary for all beneficiaries. He calculated the beneficiaries' respective shares of the net proceeds and used the percentage that each beneficiary's recovery bore to the total to make a pro rata determination of the attorneys' fees attributable to each as established in Valder's fee agreement with James. Dorothy's pro rata share of the attorneys' fees was calculated to be $123,111.81, and her net recovery after attorneys' fees and costs was calculated to be $221,736.54.

¶ 10 Dorothy expressed concern over payment of attorneys' fees to Valder from her share of the verdict, and Valder placed those funds in a special money market account pending resolution of that dispute. Eventually, Dorothy demanded that Valder immediately remit the attorneys' fees he was withholding. She contended he had no right to them because she had never agreed that Valder should represent her.[6]

¶ 11 Shortly thereafter, Valder filed a declaratory judgment action in Yavapai County to establish that Dorothy's share of the wrongful death proceeds was properly subjected to a pro rata share of the attorneys' fees incurred in obtaining those proceeds. The common fund doctrine was the basis for this claim. Valder also sought a declaration that the payment of Keenan's attorneys' fees was a matter between Keenan and Dorothy and that Valder had no obligation to compensate Keenan. The next day Keenan filed suit in Maricopa County against Valder alleging conversion and unjust enrichment with respect to the withheld sum and that Valder was holding funds "that in law belong to and are the property of" Dorothy and Keenan. Venue for this action was transferred by stipulation to Yavapai County, after which Keenan's action was consolidated with Valder's. Keenan also filed a counterclaim for conversion and unjust enrichment in the Valder litigation based upon the assertion that the withheld funds belonged to Dorothy and Keenan.[7]

¶ 12 Keenan filed a motion for summary judgment of dismissal of Valder's claims, asserting a number of reasons why Valder had no legitimate claim to the funds. Valder opposed the motion, disputing Keenan's legal arguments alleging that disputed material facts precluded summary judgment for Keenan. Valder also filed a motion for partial summary judgment on the issue of a common fund recovery. Valder argued that Keenan's motion for summary judgment could not be granted in light of Valder's pending common fund request.

¶ 13 The trial court ruled "as a matter of law that the common-fund doctrine and the equitable apportionment doctrine [did] not apply to the facts of this case." The funds were awarded to Keenan, and a judgment, certified as final pursuant to Arizona Rule of Civil Procedure 54(b), was entered. Keenan then sought and received an award of attorneys' fees based upon Arizona Revised Statutes ("A.R.S.") section 12–341.01(A) (2003), which authorizes an award of attorneys' fees

227, 889 P.2d 20 (App.1994) (two attorneys worked as a team in a wrongful death action when one attorney represented the decedent's widow and the other represented his four minor children from another marriage).

5. The verdict was reduced slightly pursuant to a settlement agreement.

6. Dorothy evidently did not dispute payment of a pro rata share of the court costs incurred by Valder.

7. Valder's declaratory judgment action was initially filed on behalf of Valder and James, and Dorothy and Keenan were both named as defendants. The counterclaim in that action was brought by Dorothy and Keenan against Valder only. The record indicates that Dorothy died thereafter, but her death was never made of record, pursuant to Arizona Rule of Civil Procedure 25, and her estate was never substituted. Following the summary judgment ruling in favor of Keenan and Dorothy, a judgment was entered awarding the disputed sums to both Keenan and Dorothy. Thereafter, a revised judgment was entered by stipulation dismissing both Dorothy and James with prejudice from the consolidated litigation. The remaining litigants on the issue of a common fund recovery are Valder and Keenan, and thus only Keenan, not Dorothy or her estate, is the claimant to the disputed sum.

to the successful party in an action arising out of contract. Final judgment was entered on this award, and then, pursuant to stipulation, a revised judgment was entered. Valder has taken timely appeals from the judgments, the appeals have been consolidated, and we have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1) and –2101 (2003).

## II.

### A.

■ ¶ 14 Our standard of review of a summary judgment ruling is de novo; that is, we determine independently whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *DeSilva v. Baker,* 208 Ariz. 597, 600, ¶ 10, 96 P.3d 1084, 1087 (App.2004). The critical question is whether the common fund doctrine applies to the facts of this particular wrongful death case. We reject the notion that because this is a wrongful death action, rather than a class action, the doctrine may not be applied. We agree that "[w]hether the doctrine applies in a particular case is not determined by a label, but rather by a proper understanding of the doctrine and its limitations." *Morris B. Chapman & Assoc., Ltd. v. Kitzman,* 193 Ill.2d 560, 251 Ill.Dec. 141, 739 N.E.2d 1263, 1272 (2000). We must consider the doctrine as it pertains to the facts at issue and then determine whether it applies.

### B.

■ ¶ 15 The common fund doctrine in Arizona has its basis in *Steinfeld v. Zeckendorf,* 15 Ariz. 335, 342, 138 P. 1044, 1047 (1914), *aff'd,* 239 U.S. 26, 36 S.Ct. 14, 60 L.Ed. 125 (1915). In that case the Arizona Supreme Court upheld an award of fees from a common fund as a matter of "right and justice." *Id.* The basis for the doctrine is the equitable consideration that parties who benefit from the efforts of counsel in creating a common fund should pay for their fair share

of the work required to bring about that benefit. *Kerr v. Killian,* 197 Ariz. 213, 217–18, ¶ 19, 3 P.3d 1133, 1137–38 (App.2000). The "doctrine serves the twofold purpose of compensating counsel for producing benefits for a class and preventing the unjust enrichment of the class members who receive them." *Burke v. Ariz. State Ret. Sys.,* 206 Ariz. 269, 272, ¶ 7, 77 P.3d 444, 447 (App. 2003).

■ ¶ 16 The common fund doctrine, however, is an exception to the general rule that attorneys' fees may be awarded "only when expressly authorized by contract or statute." *Id.; see also Kerr,* 197 Ariz. at 217–18, ¶ 19, 3 P.3d at 1137–38; *LaBombard v. Samaritan Health Sys.,* 195 Ariz. 543, 548–49, ¶ 22, 991 P.2d 246, 251–52 (App.1998). As such, there are limitations to the doctrine's use. In *Kerr,* we agreed with formulations from the United States Supreme Court that the elements of the common fund doctrine included three prongs:

> the common-fund doctrine has been appropriately applied in cases (1) where the classes of persons benefitting from the lawsuit were small and easily identifiable, (2) where the benefits could be traced accurately, and (3) where the costs could be shifted to those benefitting with some precision.

197 Ariz. at 219, ¶ 24, 3 P.3d at 1139 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 264, n. 39, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)); *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). We find this three-part test instructive here. First, as to element one, we have a small and easily identifiable class or group of people: the statutory beneficiaries (James, Jr. and Dorothy) and the statutory plaintiff (James).

¶ 17 As to the second and third elements, however, the result is different. The benefits, in this case, cannot be "traced accurately" in terms of their relationship to Valder's efforts.[8] Neither can the costs of litigation—

---

8. To the extent that *benefits* can be traced from the lawsuit to the statutory beneficiaries, as contrasted with a "general social grievance," *Boeing,* 444 U.S. at 479, 100 S.Ct. 745, we agree that the second prong would be met. However, as we set

forth below, given the characteristics of Arizona's wrongful death law, we think the analysis should apply to the benefit created by the particular attorneys' making the request. In any event, we are still left with prong three which

in this context, attorneys' fees—be shifted "with some precision," or as set forth in the Court's language "with some exactitude." *Alyeska,* 421 U.S. at 264 n. 39, 95 S.Ct. 1612; *Boeing,* 444 U.S. at 479, 100 S.Ct. 745 (citation omitted).

¶ 18 The jury awarded $400,000 in damages to Dorothy. What portion of that amount can be "traced accurately" or shifted "with some precision" or "exactitude" to Valder? If this were a case in which Dorothy was not actively represented, we would agree with Valder that both prongs were met.[9] The benefits ($400,000) could be "traced accurately" to Valder. Fees could be shifted "with some precision." This, however, is not the case here. Because of the presence of counsel, actively involved on behalf of Dorothy,[10] and the nature of Arizona wrongful death law, the benefits of Valder's role in the litigation can neither be "accurately traced" nor a fee imposed on Dorothy "with some precision" or "exactitude." An examination of Arizona wrongful death law, as applied to the facts here, makes this point.

### C.

¶ 19 Arizona Revised Statutes § 12–612 (2003) provides that "*[a]n* action for wrongful death" shall be brought by a statutory plaintiff "for and on behalf of the surviving husband or wife, children or parents." (Emphasis added.) Our courts have consistently construed this to mean that there is "one action for damages with one plaintiff and one judgment." *Begay v. City of Tucson,* 148 Ariz. 505, 508, 715 P.2d 758, 761 (1986); *see also Wilmot v. Wilmot,* 203 Ariz. 565, 569, ¶ 11, 58 P.3d 507, 511 (2002) (same); *Nunez v. Nunez,* 25 Ariz.App. 558, 562, 545 P.2d 69, 73 (1976) (stating "there is 'one action' for damages occasioned by a wrongful death," and there is "but one plain-

tiff, one of the persons designated by statute"). Because of this, "[f]ollowing a successful action, there is 'one judgment, the proceeds of which are held by the statutory plaintiff as trustee for the persons on whose behalf the suit was brought.'" *Wilmot,* 203 Ariz. at 569, ¶ 12, 58 P.3d at 511 (citation omitted).

¶ 20 Further, we have held that as to liability, it is only the statutory plaintiff that may participate:

Since the party plaintiff and the [statutory beneficiary] share the same interest, namely to establish the defendant's liability, and since an action brought pursuant to A.R.S. § 12–612 involves "one plaintiff and one judgment," ... the [statutory beneficiary] cannot be the party who seeks to establish the defendant's liability.

*Williams v. Superior Court (Hutt),* 169 Ariz. 468, 470, 820 P.2d 332, 334 (App.1991).[11] Thus, when there is but one counsel involved in the entire matter, the argument can clearly be made that there is a common fund created and held by the statutory plaintiff to which the common fund doctrine should apply.

¶ 21 However, Arizona statutes and cases also make clear that the statutory beneficiaries have the right to participate in wrongful death litigation. Additionally, damages awarded in a wrongful death suit are statutorily based on "the *injury* resulting from the death to the surviving parties who may be entitled to recover." A.R.S. § 12–613 (emphasis added). Injuries, obviously, are unique to the particular beneficiary and not necessarily tied to the liability issues that the statutory plaintiff has the sole duty of prosecuting. For this reason, "[s]imply because claims are consolidated in one action, as our statute provides, *it does not follow*

applies to the attorneys' fees themselves being "shifted with some exactitude to those benefitting." *Id.* (citation omitted).

9. Because of our conclusion, we need not reach whether a "fund" is necessary or only a "benefit" that results in a fund for the common fund doctrine to apply. That issue is subsumed within our discussion of the application of the second and third prongs.

10. This is particularly true when, as here, the *value* of one of the counsel's participation is disputed by the other involved counsel.

11. As we note below, *Wilmot* and *Nunez* suggest there may be circumstances (not present in *Williams*) where a statutory beneficiary potentially can be involved in the liability issue. *Infra* ¶ 21. It is not necessary for us to resolve that issue on these facts.

*that the interest of the various beneficiaries are identical* or that damages can be determined *other than by adding the sum* of each beneficiary's separate damages." *Wilmot,* 203 Ariz. at 571, ¶ 22, 58 P.3d at 513 (emphasis added). While a statutory plaintiff may be the only party entitled to litigate liability, "the sometimes opposing interests of different beneficiaries explains again why all beneficiaries are entitled to representation and to present their case." *Id.* at 573, ¶ 32, n. 5, 58 P.3d at 515, n. 5; *see also Nunez,* 25 Ariz. App. at 563, 545 P.2d at 74 (stating "the respective interests of the persons entitled to be compensated for the loss of the decedent are different and in some circumstances, such as here, may be conflicting" and "participation in the trial cannot be limited to one attorney").

¶ 22 Further complicating the process is the fact that in these settings "the issues of damages and liability are *inextricable;* damages [particularly in terms of assessing a case] are directly related to the degree of liability." *Williams,* 169 Ariz. at 470, 820 P.2d at 334. For that reason, we have reversed trial court orders precluding *attendance* at liability portions of wrongful death proceedings although we have affirmed the restriction on *participation* in that aspect of the case. *Id.* A statutory beneficiary is entitled to have counsel, and that counsel may indeed be required to observe liability portions of proceedings in order to accurately deal with the damages aspect of the case. *Id.*

¶ 23 To sum up, Arizona wrongful death law presents problems for the application of the common fund doctrine when more than one counsel meaningfully participate in establishing an award: (1) the "fund" (when viewed as the total damages awarded to the statutory plaintiff and beneficiaries) is based on a *composite* of damages of differing beneficiaries as contrasted with a "mathematically ascertainable claim to part of a lump-sum judgment," *Boeing,* 444 U.S. at 479, 100 S.Ct. 745; (2) those damages are separate and distinct and statutory beneficiaries may use separate counsel to establish them, *Wilmot,* 203 Ariz. at 573, ¶ 32, n. 5, 58 P.3d at 515, n. 5; *Nunez,* 25 Ariz.App. at 563, 545 P.2d at

74; (3) the only aspect of the case that the statutory plaintiff necessarily establishes for represented statutory beneficiaries is liability, *not* their damages, *see Nunez,* 25 Ariz. App. at 563, 545 P.2d at 74; *Williams,* 169 Ariz. at 470, 820 P.2d at 334; and (4) the "fund" from which Valder seeks recovery (the $400,000 awarded to Dorothy) is "inextricably" interwoven with considerations of damages and liability in which both sets of lawyers participated.

### D.

¶ 24 Applying the principles from Arizona wrongful death law set forth above does not bode well for establishing a claim under the common fund doctrine to the facts of this case. Although counsel for the statutory plaintiff undoubtedly worked a benefit for the statutory beneficiaries in this matter, that is not the standard for recovery under the common fund doctrine. The trial court must be able to "trace accurately" the benefits and allocate the costs of litigation with some "precision" or "exactitude." *Kerr,* 197 Ariz. at 219, ¶ 24, 3 P.3d at 1139; *Boeing,* 444 U.S. at 479, 100 S.Ct. 745. Here, there is no mathematically precise claim to a lump sum; there are separate and distinct injuries that pertain solely to statutory beneficiaries; other counsel participated in establishing those damages and evaluating them for his client; and the issues of damages and liability are "inextricably" interwoven. The statutory beneficiaries have an absolute right to participate in establishing their damages. Dorothy exercised that right here. On these facts, as a matter of law, a specified portion of the $400,000 award cannot be "traced accurately" to Valder rather than Keenan. More generally, when two counsel are involved in issues that are "inextricable," how can a trial judge allocate fees "with some precision" or "exactitude"?

¶ 25 We recognize that trial judges are equipped to allocate fees among lawyers when required to do so, but that is not the standard here. The standard, in order to *qualify* for an award of fees under the common fund doctrine, is whether the benefits can be "traced accurately" and the costs of litigation allocated "with some precision" or

"exactitude." *Kerr*, 197 Ariz. at 219, ¶ 24, 3 P.3d at 1139; *Boeing*, 444 U.S. at 479, 100 S.Ct. 745. On the facts here—two sets of lawyers participating in the recovery of the monies in dispute, the issues being "inextricably intertwined," and the lawyers seeking recovery doing no more than they would have done for their own clients—the standard from *Kerr* has not been met.

¶ 26 Keenan also addressed the specific issues raised as a result of Denver Robinson, Dorothy Evan's husband, initially claiming damages as a statutory beneficiary. As Valder acknowledges in his brief, "[t]he Keenan firm had to spend significant time sorting out the resulting family law issues, while the Valder firm had to spend significant time defending against the use of this claim to embarrass the plaintiffs and impeach the testimony of the Evanses in the wrongful death litigation." Opening Brief at 20, n.11. The cases are clear that the common fund doctrine was not meant to reimburse a party or its lawyers for expenses against an opposing party. *See Burke*, 206 Ariz. at 273, ¶ 9, 77 P.3d at 448 ("The common fund doctrine is based on an equitable principle of allocating attorney fees among the benefitted group, not shifting them to the opposing party."); *see also Steer v. Eggleston*, 202 Ariz. 523, 47 P.3d 1161 (App.2002); *Municipality of Anchorage v. Gallion*, 944 P.2d 436 (Alaska 1997); *Mountain W. Farm Bureau Mut. Ins. Co. v. Hall*, 308 Mont. 29, 38 P.3d 825 (2001). Rather, the purpose is to award fees when there has been a common benefit as a result of a common fund. *Burke*, 206 Ariz. at 272, ¶ 7, 77 P.3d at 447.

¶ 27 By way of contrast and example only, in the Illinois wrongful death case in which the common fund doctrine was applied, the lawyers seeking recovery on the common fund theory were the only lawyers involved in obtaining an $800,000 settlement on behalf of all plaintiffs. *Kitzman*, 251 Ill.Dec. 141,

739 N.E.2d at 1274. The other lawyers involved came to the table after the recovery had been obtained. *Id.* at 1266. Further, in *Kerr* itself the lawyers obtained a judgment such that all that was required of those benefitting from the judgment was to apply "the formula for computing individual refunds" and "prove their individual claims against the judgment fund." 197 Ariz. at 219, ¶ 24, 3 P.3d at 1139. In *Kerr*, "the judgment fund itself [was] a quantifiable sum . . . created by the litigation undertaken by the representative plaintiffs." *Id.* Those are simply not the facts here. Keenan participated in the judgment that was created. He did so after Valder's predecessor specifically told Dorothy that there was a conflict in being represented by the same counsel. Though the need for separate counsel is now disputed by Valder, it is uncontested that it was initially brought about because of the advice of counsel for the statutory plaintiff. Thus, not only is there no ability for the respective benefits of counsel to be "traced accurately," counsel for the statutory plaintiff was the initial reason this lack of "precision" or "exactitude" exists.

¶ 28 There are additional reasons for finding the common fund doctrine inapplicable on the facts here. First, the doctrine itself is an exception to the general rule that a lawyer may not obtain fees absent a contract or a statutory provision. *Id.* at 217, ¶ 19, 3 P.3d at 1137. Ethical rules also require written fees agreements. Ariz. Rules of Prof'l Conduct E.R. 1.5(b). It furthers the policy of those rules to have any exceptions be based on being able to "trace accurately" or at least "with some precision" or "exactitude." Relaxing the standard, for example to accommodate a counsel who can show he or she did the "lion's share" of the work, *Kline v. Eyrich*, 69 S.W.3d 197, 204–05 (Tenn.2002), essentially modifies the standard.[12] This is

---

12. We recognize that there are common fund cases awarding fees to "lead counsel" upon a showing that the participation of the various counsel was "unequal." *See, e.g., Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 772 (9th Cir.1977); *see also* Jean F. Rydstrom, Construction and Application of "Common Fund" Doctrine in Allocating Attorneys' Fees Among Multiple Attorneys Whose Efforts Were Unequal in Benefitting Multiple Claimants, 42 A.L.R. Fed. 134 (2005) (collecting and analyzing cases). We do not view this standard (lawyers' participation "unequal") as meeting the requirement that fees can be shifted "with some precision" or "exactitude." Even if this standard was applicable, it is not lost on us that, while viewing the facts in a light most favorable to Valder, the trial court may have considered that Valder's fee on $2

particularly so, when, as here, the work done by counsel that benefitted the statutory beneficiaries was no greater than that which was done for the statutory plaintiff with whom counsel had a fee agreement.

¶ 29 Additionally, when benefits cannot be "traced accurately" and costs not "shifted with precision," satellite litigation is required to resolve differences. It would be necessary to determine which lawyer did what and the extent to which that work contributed to the verdict. In many cases, and such is the case here, the only solution would be a costly hearing to present the contested views. The policy of this State is to avoid, rather than promote, litigation. *See, e.g., Foy v. Thorp,* 186 Ariz. 151, 153, 920 P.2d 31, 33 (App.1996) (stating that Arizona law favors arbitration as a matter of public policy); *see also* A.R.S. § 12–1501 (2003); *Clarke v. ASARCO Inc.,* 123 Ariz. 587, 589, 601 P.2d 587, 589 (1979). When given a choice, we should construe the rules, whether common law or statutory, consistent with this policy.

■ ¶ 30 For these reasons, we agree with the trial court that as a matter of law the common fund doctrine was not applicable to the facts of this wrongful death case.[13]

### III.

■ ¶ 31 Keenan sought an award of attorneys' fees based on A.R.S. § 12–341.01(A)

(2003), alleging that Valder had posited his case as one arising out of contract. The trial court ruled that the statute applied because the claim arose from "an implied contract" and awarded fees. We find that the statute does not apply to this claim and therefore find the award to be erroneous.

¶ 32 As argued by Valder, this claim is one in equity and should be likened to a contract implied in law based on the relationship of the parties. *See Barmat v. John and Jane Doe Partners A–D,* 155 Ariz. 519, 521, 747 P.2d 1218, 1220 (1987) (stating implied in law contracts are "obligations 'created by the law without regard to expressions of assent by either words or acts.'" (citations omitted)). Valder's claim arises from a relationship with Dorothy that was based on the wrongful death statute, not made by words or acts between the parties. As our supreme court stated in *Barmat,* "where the implied contract does no more than place the parties in a relationship in which the law then imposes certain duties recognized by public policy, the gravamen of the subsequent action for breach is tort, not contract." *Id.* at 523, 747 P.2d at 1222 (citations omitted).

¶ 33 As noted, the critical question in this case is whether the common fund doctrine applies. Though we have rejected Valder's claim that it applies in this case, we agree that were it applicable, it would be based upon the statutory duties arising out of Ari-

---

million of the $2.4 million total judgment was an appropriate fee on the facts of this case and another reason the trial court found the common fund doctrine should not be applied.

**13.** The conversion claim filed by Keenan was taken under advisement by the trial court and Valder's opening brief indicates that the claim is still pending in the trial court. This issue is not before us on appeal. We note, however, that until this opinion there has been no Arizona authority that addresses the common fund doctrine in the context of a wrongful death case, which should impact the trial court's consideration of the pending conversion claim.

Arizona follows the definition of conversion set forth in Restatement (Second) of Torts § 222A(1) (1965): "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen,* 209 Ariz. 462, 472, ¶ 34, 104 P.3d

193, 203 (App.2005); *see also Focal Point, Inc. v. U–Haul Co. of Ariz.,* 155 Ariz. 318, 319, 746 P.2d 488, 489 (App.1986). As we noted in *Focal Point,* "Arizona law on the tort of conversion stems from the seminal case of *Shartzer v. Ulmer,* 85 Ariz. 179, [184], 333 P.2d 1084, [1088] (1959), which defined conversion as 'any act of dominion *wrongfully* exerted over another's personal property in denial of or inconsistent with his rights therein.'" 155 Ariz. at 319, 746 P.2d at 489 (emphasis added). As part of our opinion today, we expressly note that there was a good faith legal basis on the part of Valder to assert that the common fund theory applied here and that maintaining funds in a trust account, as Valder did, was appropriate given the state of Arizona law prior to this opinion. Ariz. Rules of Prof'l Conduct ER 1.15(d) and (e), cmt. 4 (2004 amendment); *see also* Charles M. Cork III, A Lawyer's Ethical Obligations When the Client's Creditors Claim a Share of the Tort Settlement Proceeds, 39 Tort Trial & Ins. Proc. L.J. 121, 130 (2003); Restatement (Third) of the Law Governing Lawyers § 45(2)(d) (2000).

zona wrongful death law. As such, for purposes of attorneys' fees, the claim is more analogous to *Barmat*. We therefore find that § 12–341.01(A) does not apply and reverse the trial court's award of attorneys' fees to Keenan. We likewise deny Keenan's request for attorneys' fees on appeal. We award Keenan costs as the prevailing party pursuant to Arizona Rule of Civil Appellate Procedure 21.

## IV.

¶ 34 For the foregoing reasons, we affirm the trial court's grant of summary judgment, but reverse the trial court's award of attorneys' fees.

CONCURRING: DONN KESSLER and JAMES B. SULT, Judges.